IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **HEATHER MAYBERRY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **Civil No.** 14-cv-1139-CJP[1] |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social** ) | |
| **Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. §405(g), plaintiff Heather Mayberry is before the Court, represented by counsel, seeking judicial review of the final agency decision denying her Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. §423.

**Procedural History**

Plaintiff initially applied for benefits in September 2011, alleging disability beginning on June 30, 2009. (Tr. 13). The claim proceeded to a hearing before ALJ Michael Hellman, who issued an unfavorable decision on July 26, 2013. (Tr. 13-24). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 20.

1

### Issues Raised by Plaintiff

Plaintiff raised the following points:

1. The ALJ's conclusion that plaintiff's impairments do not meet or equal a listed impairment is not supported by substantial evidence.

2. The ALJ's credibility analysis was not supported by evidence in the record.

### Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden

shifts to the Commissioner at step five to show that the claimant can perform some other job. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984).** See also, **Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled… If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See**, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)(citing Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995))**.

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the

ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Hellman followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since her application date. The ALJ found that plaintiff had severe impairments of affective disorders, anxiety disorders, and a history of substance abuse. The ALJ further determined that these impairments did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels with mental limitations. Based on the testimony of a vocational expert (VE) the ALJ found that plaintiff could perform jobs which existed in significant numbers in the national and local economy. (Tr. 15-24).

### The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

1. **Agency Forms**

Plaintiff was born in 1989 and was twenty years old at her alleged onset date. (Tr. 142). She was five feet four inches tall and weighed one hundred and

5

thirty-five pounds. (Tr. 146). Plaintiff completed the tenth grade and previously worked for a short time as a cashier at Walmart. (Tr. 147).

Plaintiff claimed her anxiety attacks, depression, panic disorder, bipolar II disorder, and social anxiety made her unable to work. (Tr. 146). She took Effexor, Zyprexa, Ativan, and Klonopin for bipolar II disorder and depression, as well as Vistaril and Xanax for anxiety (Tr. 183).

In October 2011, plaintiff submitted a function report. (Tr. 168-75). She stated that her anxiety made it difficult for her to interact with people and her bipolar disorder caused her to have moments of intense anger. Her son had serious health problems and she took care of him for most of her day. (Tr. 168). She also went with her son to occupational, physical, and speech therapy three times a week. (Tr. 168-69).

Plaintiff had difficulty sleeping due to nightmares and hallucinations. (Tr. 169). She made simple meals like sandwiches and frozen dinners and was able to clean and do the laundry for a short time every week. (Tr. 170). Plaintiff's anxiety prevented her from driving and she relied on her husband to drive her anywhere she needed to go. (Tr. 171). She enjoyed taking pictures and watching television with her son. (Tr. 172). Plaintiff claimed to have problems concentrating, understanding, and getting along with others. (Tr. 173). She preferred not to speak so that other people would not know she had bipolar disorder. (Tr. 175).

Plaintiff's mother-in-law also submitted a function report in October 2011. (Tr. 159-66). She stated that plaintiff's husband did most of the cooking and he

helped plaintiff take care of their son. (Tr. 160). She stated plaintiff could not be around crowds and plaintiff did not drive. (Tr. 169). Plaintiff's mother-in-law stated plaintiff hurt herself and had problems with her family. She felt plaintiff had difficulties talking, hearing, remembering, completing tasks, concentrating, understanding, and following directions. She thought plaintiff was easily confused because she thought everyone was judging her. (Tr. 164).

## 2. Evidentiary Hearing

Plaintiff was represented by counsel at the evidentiary hearing held on July 1, 2013. (Tr. 29). She had been married for two years and had a four year old son with her husband. (Tr. 34). Her husband worked at a music store that his grandfather owned. (Tr. 35). She completed the tenth grade and never obtained a GED. She worked at Walmart on three separate occasions but her anxiety made it difficult for her to be around others. (Tr. 35).

Plaintiff's son needed regular care because he had two open-heart surgeries, a small pulmonary artery, and several other health issues. (Tr. 36). She and her husband took their son to his doctor appointments and therapy sessions. (Tr. 37). Plaintiff spent most of her day taking care of her son. At the time of the hearing, plaintiff stated she was having frequent panic attacks. As a result, a few times a week her husband had to leave work to come care for their son. (Tr. 38). She stated that she hyperventilated and occasionally blacked out when she had a panic attack. Her doctors prescribed her Xanax to help deal with her panic attacks but it made her drowsy. (Tr. 39). Plaintiff's bipolar disorder also caused her to have drastic mood swings. (Tr. 41). She took Zyprexa which

7

helped reduce the amount of "bipolar outrages" she had every month. (Tr. 42). Plaintiff stated she was depressed and had difficulty getting out of bed some days. (Tr. 43).

When plaintiff was younger she was hospitalized for suicidal thoughts. (tr. 45). She still had suicidal thoughts a few times a week but took medicine and spoke with her husband to combat those thoughts. (Tr. 46). Plaintiff felt her son's needs were greater than her potential need to be hospitalized regularly for her suicidal thoughts. (Tr. 50). For the previous two years, plaintiff received counseling once a month. (Tr. 47).

Plaintiff's husband also testified. (Tr. 51). He stated that he drove plaintiff and their son to his appointments and would typically drop them off. (Tr. 53). He always drove because plaintiff was too scared to drive on her own. (Tr. 56). He also stated that plaintiff's bipolar disorder turned her into a "totally different" and aggressive person. (Tr. 54). He testified that his wife had panic attacks at least twice a week where she gasped for air and cried. They would last for an hour to an hour and a half and he often had to intercede. (Tr. 55).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age, work history, and educational background that was able to perform a full range of work at all exertional levels but was limited to simple, routine, and repetitive tasks. Additionally, the person's work environment would need to be free of fast paced production requirements, involve only simple work-related decisions, and have few workplace changes. The person

would also be limited to occasional interaction with the public, co-workers, and supervisors. (Tr. 57).

The VE testified that the person could perform work that existed in significant numbers in the national economy. Examples of such jobs are hand packer, assembler, and sorter. (Tr. 57-58). The VE stated that all work would be precluded if the person had off task behavior up to fifteen percent of the workday. (Tr. 58).

### 3. Medical Evidence

In 2003, plaintiff was first hospitalized for mental illnesses when she was thirteen years old. (Tr. 337-76, 438-449). She was first admitted for suicidal thoughts, and a few months later she was hospitalized for homicidal ideations. (Tr. 368, 438). She was diagnosed with major depressive disorder. (Tr. 438-449). In 2007, plaintiff was hospitalized for depression, drug abuse, and suicidal thoughts. (Tr. 383). She reported self-mutilation and homicidal thoughts. (Tr. 390).

In 2010, plaintiff began treatment with Physician Assistant Rollin Perkins at Rural Health, Inc. (Tr. 289). She was diagnosed with major depressive disorder, generalized anxiety disorder, and possible borderline personality disorder. She was given a GAF score of 65 and prescriptions to help with her anxiety. (Tr. 290).

Plaintiff presented at Rural Health, Inc. for treatment over thirty times from 2010 until the hearing in 2013. (Tr. 224-26, 263-98, 464-76, 484-85, 488-501, 504-09). She had suicidal thoughts and regularly complained of intense

anxiety. Her GAF score ranged from 60-65 and her mood was typically blunted. (E.g., Tr. 265, 272, 289, 464, 494). Throughout the course of treatment, plaintiff was diagnosed with post-traumatic stress disorder, generalized anxiety disorder, borderline personality disorder, bipolar II disorder, and major depression. (E.g., Tr. 264-65, 465, 468, 494). She was given prescriptions for Valium, Xanax, Buspar, Effexor, Propranolol, Topamax, Klonopin, and Zyprexa, (Tr. 264, 491, 496-7).

Plaintiff occasionally reported having fewer panic attacks and a more stable mood due to her medications. (Tr. 472-75, 508-509). However, plaintiff also occasionally had decreased attention and concentration, circumstantial thoughts, preoccupation, and a labile affect. (Tr. 263-64, 265-66, 271-72, 273-74, 277-78, 490-97).

### 4. Consultative Examination

In November 2011, plaintiff had a mental consultative examination with Dr. Fred Klug. (Tr. 233-37). Plaintiff arrived with her husband and was alert and fully oriented. She had a history of substance abuse and was taking Klonopin, Zyprexa, and Effexor. Dr. Klug opined that plaintiff's attentional span was adequate and her concentration was good. Her short-term memory was impaired bur her new learning ability was good and her long term memory was intact. Dr. Klug stated that plaintiff's fund of knowledge was restricted and her insight was poor. Her ability to do simple calculations, abstract thinking, and judgment was good. He felt her affect was constricted and her predominant mood was dysphoric. (Tr. 236-37).

**5. RFC Assessment**

In November 2011, state agency psychologist Donald Henson, Ph.D. completed an assessment of plaintiff's mental RFC capabilities. (Tr. 252-54). He felt plaintiff was moderately limited in her ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and the ability to interact appropriately with the general public. (Tr. 252-53). Dr. Henson also felt plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 253).

## Analysis

The Court turns first to plaintiff's challenge to the ALJ's credibility findings. ALJ Hellman found plaintiff not credible because of her daily activities, inconsistencies within the record, and medical evidence. (Tr. 21).

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).** "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." ***Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).**

The ALJ is required to give "specific reasons" for his credibility findings. ***Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).** It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. ***Ibid***. See also, ***Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)**(The ALJ "must justify the credibility finding with specific reasons supported by the record."). If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. ***Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3. While ALJ Hellman considered several of these factors his analysis is legally insufficient.

Plaintiff argued that the ALJ incorrectly considered plaintiff's daily activities, particularly in caring for her son, in forming the credibility determination. The Seventh Circuit has repeatedly held it is appropriate to consider daily activities but it should be done with caution, "especially when the claimant is caring for a family member." ***Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014).** As plaintiff notes, the Seventh Circuit held that an ALJ cannot equate caring for a family member and performing housework with work in the labor market. ***Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir.**

2005); ***Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006); *Beardsley*, 758 F.3d 838**. The ALJ stated that plaintiff was able to take care of her own personal grooming and hygiene, as well as care for her disabled son. The ALJ stated that while it was commendable plaintiff chose to devote her effort to her maternal responsibilities, it gave the impression that she was capable of sustained work activity but was not focused or motivated to do so. (Tr. 21).

Plaintiff cites the Seventh Circuit's holding in ***Gentle*** to support her contention that the ALJ erred. **430 F.3d 867.** In ***Gentle***, the court found that the ALJ was incorrect to equate the claimant's ability to perform household work with work in the labor market. ***Ibid***. The Court also noted that the ALJ erred when he failed to mention uncontested evidence that plaintiff performed her household tasks with help. ***Ibid.***

The Commissioner argues that the ALJ did not equate plaintiff's ability to care for her child with full time work, but rather that it "gave the impression" she was capable of working. This Court is unable to see the distinction the Commissioner intends to draw. The ALJ directly equates her ability to work with her ability to care for her son with the statement that "her abilities to regularly [care for her son] give the impression she is capable of sustained work." (Tr. 21). This is error.

While plaintiff did take care of her son and perform some household chores, the ALJ overlooked the limitations she faced in the tasks he felt made her capable of sustained work. Plaintiff and her husband testified that plaintiff could not drive to her son's appointments or be in public alone due to her

13

anxiety. (Tr. 46, 49). Plaintiff and her mother in law reported that her husband prepared most meals and helped with most of the work around the house. (Tr. 160-61). Plaintiff reported making simple microwavable meals or sandwiches, and was able to do laundry and clean a few times a week for a few hours. (Tr. 168-70). Additionally, both plaintiff and her husband testified that plaintiff's panic attacks were so extreme that at least twice a week her husband had to leave work to come home and help care for their son. (Tr. 44-45, 55-56). This evidence is not contested.

Plaintiff's daily activities can all be done with significant limitations and do not indicate she can complete an entire workday or workweek. The ALJ is required to address evidence that demonstrates plaintiff performed her daily activities without difficulty. **Gentle, 430 F.3d 867.** The ALJ's reliance on her daily activities and caring for her son without discussing the limitations plaintiff faces in performing these activities in her credibility analysis is inadequate.

The ALJ then focused on what he described as "inconsistencies" within the record. First, he noted that plaintiff and her husband said she did not drive but plaintiff reported she did not need to be accompanied to her son's therapy sessions. (Tr. 21). As plaintiff noted, and the Commissioner concedes, the ALJ made an incorrect assumption with considering this an inconsistency. Plaintiff and her husband testified that she had not driven in years. She also reported her husband drove her to her son's appointments, but that he dropped them off. She testified she could attend the appointments without her husband

14

because her son had seen the same therapist for years and she was comfortable with her. She did not need to be accompanied to the appointments, but she did need to be driven. The ALJ incorrectly placed weight on an inconsistency that did not necessarily exist.

The only other inconsistency the ALJ noted was that plaintiff told her consultative examiner that her longest job was eight months, but her work history report indicates her longest job was seven months. (Tr. 21, 196, 233). Plaintiff told the examiner she worked one month longer than she actually worked and the ALJ seemingly placed a great deal of weight on this inconsistency. (Tr. 21, 233). While the one month discrepancy is an inconsistency, it is incredibly minor. Placing weight on this small discrepancy makes it seem as though the ALJ was searching for a reason to discount plaintiff's credibility.

Finally, the ALJ looked at plaintiff's objective medical evidence in forming his credibility analysis. While the ALJ did review plaintiff's records in opposition to his conclusion earlier in his opinion, he seemingly forgot them when analyzing plaintiff's credibility. Simply stating that these problems exist but not factoring them into his opinion is inadequate. The ALJ must build a logical bridge to his conclusions which requires more than a mere recitation of the record. **See, *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 352 (7th Cir.2005); *Barrett v. Barnhart,* 355 F.3d 1065, 1068 (7th Cir.2004),** ***Scott v. Astrue,*** **647 F.3d 734, 740 (7th Cir. 2011).**

The ALJ noted ten of plaintiff's visits to the doctor from February 2012 through June 2013 where her mood displayed a full range, her speech was normal, and her thought content was unremarkable. (Tr. 22). However, those records represent less than one third of her visits to the doctor regarding her mental health from her alleged onset date until the date of the hearing. Additionally, during the time frame of records he referenced, he failed to note her increased stress, suicidal thoughts, extreme anxiety, difficulty sleeping, and continuing panic attacks. (Tr. 464, 472, 488, 492, 495).

The ALJ noted plaintiff had PTSD but fails to mention any of her other diagnoses or her frequent changes in medications. (Tr. 22, 224, 264, 465, 484, 491). This is error. The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting [his] ultimate conclusion while ignoring the evidence that undermines it." **Moore v. Colvin, 743 F.3d 1118, 1123 (7th Cir. 2014)**.

The ALJ also discussed that plaintiff and her husband alleged she was regularly seeing a counselor, but her records indicated otherwise. He stated that plaintiff regularly saw Physician Assistant Perkins and not the counselor Miss Herzog. Additionally, plaintiff had not been hospitalized during the period at issue. (Tr. 22). First, plaintiff's records with Rural Health, Inc. are extensive. Often the signature on her records is unintelligible or contains no signature at all. (E.g., Tr. 224-30, 264-88). It is unclear how the ALJ determined which

16

health provider was treating plaintiff when it is not determinable from the records.

Second, plaintiff testified that she feels the need to be hospitalized at times but she has to care for her son. She knew she could be hospitalized for days or weeks and her son's healthcare would suffer as a result. Consequently, she sought treatment from counselors and her doctor appointments. (Tr. 49-50). These facts do not indicate that plaintiff is entitled to benefits or is disabled, but they are indicative of a larger picture the ALJ failed to factor in his analysis.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." ***Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).** ALJ Hellman simply failed to do so here by placing too much emphasis on plaintiff's daily activities, minor inconsistencies, and selectively considering the record. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." ***Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).**

It is not necessary to address plaintiff's other points at this time. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

17

## Conclusion

Plaintiff's motion for summary judgment is granted. The Commissioner's final decision denying Heather Mayberry application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATE:  September 1, 2015.

<u>s/ Clifford J. Proud</u>

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**